**Frank MERTES, as personal representative of the Estate of Patricia Mertes, Respondent,**

v.

**ESTATE OF E.L. KING, Jr., et al., Appellants.**

**No. C2–92–2080.**

Court of Appeals of Minnesota.

June 15, 1993.

Mark P. Wine, John C. Goodnow, Oppenheimer, Wolff & Donnelly, Minneapolis, for respondent.

Kent A. Gernander, Cindy K. Telstad, Streater, Murphy, Gernander, Forsythe & Telstad, P.A., Winona, for appellants.

Considered and decided by ANDERSON, C.J., and HUSPENI and DAVIES, JJ.

## OPINION

DAVIES, Judge.

Appellants Elizabeth S. King and the Winona National and Savings Bank, as personal representatives of the Estate of E.L. King, Jr., appeal a judgment in favor of respondent Frank Mertes, personal representative of the Estate of Patricia Mertes. A jury found that Patricia Mertes and her uncle, E.L. King, Jr., had a joint ownership interest in a painting (or perhaps five paintings); that Patricia Mertes's ownership interest in the painting (or the five paintings) was worth $500,000; and that E.L. King, Jr., converted Patricia Mertes's interest when he settled a claim to the paintings brought against him by Irwin Jacobs. We affirm.

## FACTS

In 1885, J.R. Watkins established in Winona the headquarters for The J.R. Watkins Company, a business that began with door-to-door sales of liniment. The company expanded over the years and the "Watkins man" became a staple of life in the Midwest and beyond. This case involves a dispute among Watkins' heirs over an oil painting by Frederic Remington entitled "The Apaches!"

Grace Watkins, the daughter of J.R. Watkins, married E.L. King, the son of the woman who was to be Watkins' second wife. Grace and E.L. King had two children: Mary Eleanor King and E.L. King, Jr. (hereafter "King Jr."). E.L. King became president of The J.R. Watkins Company in 1932.

Mary Eleanor King adopted a baby girl in March 1934. In October 1971, this adopted daughter, Patricia Mertes, was left partially paralyzed by a car accident and subsequently gave complete power of attorney to her husband, Frank Mertes. King Jr. died on December 18, 1987.

In April 1988, Frank Mertes brought this action against the Estate of King Jr. on behalf of Patricia Mertes. Patricia Mertes died on November 15, 1991, and the action was carried on by her estate. A jury trial began in March 1992.

Relevant testimony at trial was that in March 1952, Mary Eleanor King told Patricia and Frank Mertes that she and her brother, King Jr., jointly owned E.L. King's collection of five western paintings displayed at the Watkins Company headquarters, but that Mary Eleanor King did not have a right to possession until King Jr. either died or gave up possession. Respondent Mertes also alleged that Mary Eleanor King told Patricia and him that she was giving her half interest in the paintings to Patricia Mertes. Mertes testified that the understanding regarding the western art collection was discussed on many family occasions.

Other testimony was that on November 15, 1976, King Jr.'s attorney advised Philip G. Arneson, Frank and Patricia Mertes's attorney, that four of the five "Remington" paintings appeared to have been bought with company funds and appeared to be forgeries. Evidence at trial showed that E.L. King bought the fifth painting, "The Apaches!", separately in 1924. Respondent testified that at the time of a stockholders' meeting on November 24, 1976, an oral agreement regarding the western art collection, including "The Apaches!," was entered into by King Jr. (through his sons) and Patricia Mertes (through attorney Arneson). Respondent testified that they agreed to divide the paintings when King Jr. no longer wanted them or died. The jury also heard testimony of King Jr.'s sons in which they denied making this oral agreement.

There was evidence that attorney Arneson and Frank Mertes, at the request of King Jr., attended a bankruptcy court hearing in December 1978 concerning the sale of Watkins Products, Inc., successor to the J.R. Watkins Company. The bankruptcy court approved an offer from Irwin Jacobs's company, Jacobs Industries, to buy the company. Shortly thereafter, King Jr. moved the paintings from company headquarters to his home.

On January 1, 1979, at the request of King Jr., Frank Mertes had appraisers come to the home of King Jr. to put a value on the western art collection. The appraisers indicated that four of the "Remingtons" were forgeries, but showed great interest in "The Apaches!" Frank Mertes and attorney Arneson testified that King Jr. joined in banter that tended to show that King Jr. knew the details of the agreement between his sons and attorney Arneson to divide the western art between Patricia Mertes and her cousins.

In January 1979, after Jacobs claimed that the western art collection was the property of Watkins Products, now his company, the bankruptcy court held a hearing on the ownership of the art. At the hearing, attorney Arneson stated on the record that Patricia Mertes claimed an ownership interest in the western art collection. After this hearing, King Jr. returned the western art collection to Watkins Products, pending resolution of the ownership dispute.

When King Jr.'s deposition was taken in the bankruptcy proceeding on January 12, 1979 (the transcript of which was read to the jury in this case), he testified that the western art collection was his father's personal property. He also testified that he believed his sons and their cousin, Patricia Mertes, had an agreement that he could use the paintings so long as he wished, but that when he died or no longer wanted them they would be divided among his sons and Patricia. He further stated that Arneson, who with Frank Mertes was present at the deposition, might be able to supply details of the agreement among his sons and their cousin.

At trial, Frank Mertes testified that he left the bankruptcy deposition of King Jr.

thinking it had been clearly shown that the western art collection was family property, not property of the Watkins Company. Frank Mertes also testified that, despite many subsequent contacts and business dealings, King Jr. never brought up the art issue again. Both Frank Mertes and attorney Arneson, on direct and redirect examination in this case, testified that they thought the paintings were in a family bank vault awaiting resolution of the dispute with Jacobs.

The next month, February 1979, Jacobs asked to inspect King Jr.'s jade collection. Edward M. Cohen, attorney for King Jr. at that time, filed an objection to the inspection and shortly thereafter King Jr., Jacobs Industries, and Watkins Products filed a stipulation in bankruptcy court which provided:

> E.L. King has released all claims to the [western art collection, including "The Apaches!"] and * * * Watkins Products, Inc. and Jacobs Industries * * * have released all claims to all jade sculptures and art objects presently in the possession or under the control of E.L. King.

Patricia and Frank Mertes were not informed of this settlement.

Jacobs sold "The Apaches!" for $1,000,-000. Attorney Cohen, called as a witness for respondent at trial, testified on direct examination that the jade had "considerable value."[1] In May or June 1984, Frank Mertes read an article in *The Twin Cities Reader* about Jacobs that led him to discover that King Jr. had released all claims to the western art collection and, then, to commence this action.

Appellants moved for a directed verdict at the close of respondent's case and again at the close of all the evidence, but the motions were denied and the case was submitted by special verdict. On March 31, 1992, the jury answered all special verdict questions in favor of respondent. The jury determined (1) that Patricia Mertes had a joint ownership interest in the paintings, which interest had a fair value of $500,000, and that King Jr. converted that interest by releasing claims to the paintings; (2) that King Jr. breached a fiduciary duty to Patricia Mertes by releasing claims to the paintings and committed fraud by omission in failing to inform her of his release of claims to the paintings, and that $625,000 [$500,000 plus interest] would be fair and adequate compensatory damages to the Estate of Patricia Mertes for King Jr.'s breach of fiduciary duty and fraud by omission; (3) that King Jr. fraudulently concealed from Patricia Mertes the existence of a cause of action against him concerning the paintings; and (4) that in the exercise of reasonable diligence, Patricia Mertes could not have discovered a cause of action before April 22, 1982.[2] On April 29, 1992, respondent filed notice of election of recovery, choosing the conversion remedy.

The trial court subsequently denied appellants' motions for judgment notwithstanding the verdict and for a new trial, entering judgment in favor of respondent on October 19, 1992. This appeal followed.

## ISSUES

I. Was the evidence sufficient to support the verdict?

II. Did the trial court abuse its discretion by denying appellants' motion for a new trial on the ground that evidence regarding the jade was irrelevant and prejudicial?

III. Did the trial court abuse its discretion in denying appellants' motion for a new trial on the ground that the trial court erred in refusing to instruct the jury separately on causation?

IV. Did the trial court abuse its discretion in denying appellants' motion for a new trial on the ground that respondent's counsel committed prejudicial misconduct during closing argument?

---

1. The total value of the jade listed in the 1952 distribution decree was $22,454. From in limine discussions reported in the transcript, it appears the jade was worth $10,000,000 at the time of the bankruptcy dismissal stipulation.

2. Appellants do not challenge the jury determination that the statute of limitations does not bar the action because King Jr. concealed the facts underlying Patricia Mertes's cause of action.

## ANALYSIS

### I.

Appellants contend respondent failed to prove that Patricia Mertes had an ownership interest in the paintings or that King Jr. caused her any loss.

When sufficiency of the evidence is challenged, this court applies the same standard of review to denial of a motion for a directed verdict as to denial of a motion for judgment notwithstanding the verdict. *Dean v. Weisbrod*, 300 Minn. 37, 41, 217 N.W.2d 739, 742 (1974). This court asks whether the jury's findings are

> manifestly against the entire evidence or [are] contrary to the law applicable in the case or if the evidence is so clear and conclusive as to preclude a reasonable difference of opinion among fair-minded [people].

*Id.* at 42, 217 N.W.2d at 742–43. When reviewing denial of a motion for a new trial on the ground the verdict is not justified by the evidence, this court asks whether

> the verdict is so contrary to the preponderance of the evidence as to imply that the jury failed to consider all the evidence or acted under some mistake or from some improper motive, bias, feeling or caprice, instead of honestly and dispassionately exercising its judgment.

*LaValle v. Aqualand Pool Co.*, 257 N.W.2d 324, 328 (Minn.1977).

Under the applicable standards of review, we hold that appellants are not entitled to a directed verdict, a judgment notwithstanding the verdict, or a new trial on the ground the verdict is not justified by the evidence as to any issue.

### A. Patricia Mertes's Ownership Interest

A single witness's testimony may be sufficient to support a verdict. *Seidl v. Trollhaugen, Inc.*, 305 Minn. 506, 508, 232 N.W.2d 236, 239 (1975). The testimony of Frank Mertes standing alone is sufficient to support a finding that Patricia Mertes had an ownership interest in the paintings. Furthermore, the jury could find that the bankruptcy deposition of King Jr. supports respondent's claims.

Although appellants pointed out that respondent had no written documentation of Patricia Mertes's claimed interest in the paintings, the jury chose to believe respondent's version of events, and was free to do so. We hold, therefore, that the jury verdict is neither manifestly contrary to the evidence nor the result of caprice.

On appeal, appellants also argue for the first time that there was no "legal" transfer of ownership from Mary Eleanor King to Patricia Mertes. Appellants did not request jury instructions on the elements of a formal gift transfer, nor did they raise this issue in their post-trial motions. *See Furley Sales & Assocs. v. North Am. Auto. Warehouse*, 325 N.W.2d 20, 28 (Minn.1982) (if jury instructions are not objected to at trial or in post-trial motions, they become "law of the case"). We decline to address appellants' untimely arguments relative to the law of formal gift transfers. We confine appellants to the theories on which they based their defense at trial.

### B. Loss to Patricia Mertes Caused by King Jr.

Appellants argue that respondent had to prove that, if King Jr. had notified her that he was releasing all claims to the paintings, Patricia Mertes would have asserted her ownership interest in the paintings and been successful in that assertion. *Cf. Larson v. Archer–Daniels–Midland Co.*, 226 Minn. 315, 317, 32 N.W.2d 649, 650 (1948) (essential elements of conversion are that plaintiff possess property interest and that defendant deprive plaintiff of that interest).

Appellants argued to the jury that Patricia Mertes thought the paintings were of no value. The jury had evidence to the contrary, however, and so found. The jury could also have found, on the evidence presented, that Patricia Mertes did not intervene in the bankruptcy proceeding because she thought her interests were being protected by King Jr.

Finally, appellants argue that, until after the bankruptcy settlement, Patricia Mertes

did not have evidence that E.L. King purchased "The Apaches!" separately and personally. It was only then that an art sale catalogue from 1924 was retrieved from some King mansion trash.[3] But King Jr. had evidence that his father bought the western art, possibly including "The Apaches!," from the Watkins Company in 1945 as part of a tax audit.[4] Furthermore, the only evidence Jacobs had at the time of the settlement showed that Watkins Co. paid for the four fake Remingtons, but not "The Apaches!" Finally, Patricia Mertes, who was then alive, could have been called to testify in the bankruptcy case and given testimony that her mother told her that her grandfather had given the five paintings to her mother and uncle.

The jury could find it was more likely than not that Patricia Mertes would have prevailed on her claim that "The Apaches!" was family property. We affirm the trial court's denial of appellants' motions for a directed verdict, judgment notwithstanding the verdict, and a new trial. The verdict is supported by the evidence.

## II.

■ Appellants next contend that the trial court abused its discretion in denying appellants' motion for a new trial on the ground that evidence regarding the jade was irrelevant and prejudicial. *See Colby v. Gibbons*, 276 N.W.2d 170, 175 (Minn. 1979) (rulings on admissibility of evidence within trial court's discretion). The evidence concerning the jade, to which Jacobs released all claims, was relevant to show the context within which King Jr. released all claims to the western art collection. *See id.* at 176 (evidence that is probative of a material fact issue is relevant).

■ Appellants also claim that they were prejudiced by the jury learning the value of the jade. *See* Minn.R.Evid. 403 (if danger of unfair prejudice outweighs probative value, relevant evidence may be ex-

cluded). While appellants claim they were forced to reveal the value, it was they who chose to introduce into evidence the 1952 distribution decree of E.L. King's estate to show he had left the jade to King Jr. and to show that the agreement with Jacobs was reasonable because King Jr. had a clear claim to the jade in contrast to an undocumented claim to the paintings. Moreover, there does not appear to have been anything to prevent them from omitting the dollar value of the jade. Appellants' own witness testified that the jade had "considerable value." Finally, the value had relevance to a jury weighing whether the claimed bargain was made.

## III.

■ Appellants also contend the trial court abused its discretion in denying appellants' motion for a new trial on the ground that the trial court erred in refusing to instruct the jury separately on causation of loss. We hold that the trial court did not abuse its discretion. *See Hahn v. Tri–Line Farmers Co-op*, 478 N.W.2d 515, 524 (Minn.App.1991) (rulings on propriety of jury instructions within trial court's broad discretion, and discretion must be clearly abused for instructions to be found erroneous), *pet. for rev. denied* (Minn. Jan. 27, 1992).

As discussed above, there was evidence from which the jury could find causation. *See id.* (new trial unwarranted if "verdict is not contrary to the preponderance of the evidence").

It is also noted that appellants conceded that a separate causation instruction probably was not needed for respondent's conversion theory.

## IV.

■ Finally, appellants assert that the trial court abused its discretion in denying appellants' motion for a new trial on the

---

**3.** Frank Mertes serendipitously, after the bankruptcy stipulation of dismissal, came into possession of an art catalogue, which tended to show E.L. King personally bought "The Apaches!" in 1924.

**4.** It would have been equally revealing if the tax audit purchase had not included "The Apaches!" That would suggest that painting was already family property.

ground that respondent's counsel committed prejudicial misconduct during closing argument. Appellants contend respondent's counsel acted improperly by reciting imaginary conversations based on inferences from the evidence. The conversations composed by respondent's counsel for final argument were not faithful as reportage of what occurred, as disclosed by the evidence, but, like scenes from a fine historical novel, they were revealing of reality when so understood by the jury.

We hold that respondent's counsel did not go beyond the wide latitude afforded counsel in arguing to the jury. *See Connolly v. Nicollet Hotel*, 258 Minn. 405, 419–20, 104 N.W.2d 721, 732 (1960) (counsel is given wide latitude in closing argument so long as it is based on the evidence and proper inferences therefrom). Finally, appellants were not prejudiced by respondent's counsel giving his personal opinion on the veracity of the witnesses because the trial court gave a specific curative instruction.

### DECISION

The evidence was sufficient to support the jury verdict and the trial court did not abuse its discretion in denying appellants' motion for judgment notwithstanding verdict or a new trial.

**Affirmed.**