Mary BLATZ, et al., Respondents,

v.

ALLINA HEALTH SYSTEM, d/b/a
HealthSpan Transportation
Services, Appellant.

No. C9–00–826.

Court of Appeals of Minnesota.

Feb. 6, 2001.

Chris A. Messerly, Gary L. Wilson, Anne E. Workman, Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, (for respondents).

Kay Nord Hunt, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, MN; and David C. Hutchinson, Mary H. Alcorn, Geraghty, O'Loughlin & Kenney, P.A., St. Paul, MN, (for appellant).

Steven R. Schwegman, William V. Faerber, Quinlivan & Hughes, P.A., St. Cloud, MN, (for amicus curiae Minnesota Defense Lawyers Association).

William M. Hart, Erica Gutmann Strohl, Meagher & Geer P.L.L.P., Minneapolis, MN, (for amici curiae Minnesota Hospital and Healthcare Partnership, Minnesota Medical Association, and Minnesota Medical Group Management Association).

Thomas Fraser, Kathleen M. Miller, Fredrikson & Byron, P.A., Minneapolis, MN, (for amici curiae Minnesota Ambulance Association and North Central EMS Institute).

Considered and decided by
PETERSON, Presiding Judge,
LANSING, Judge, and STONEBURNER,
Judge.

## OPINION

LANSING, Judge

Allina Health System, doing business as HealthSpan Transportation Services, contracts to provide paramedic and ambulance services to Jordan, Minnesota, and surrounding communities. A Scott County jury found Allina negligent in responding to a 911 call from the Jordan home of Mary Blatz and Patrick Sherman. The jury further found that Allina's negligence was a direct cause of Blatz's substantial injuries. Allina moved for judgment notwithstanding the verdict or a new trial and also requested a *Schwartz* hearing to inquire into the truthfulness of two jurors' voir dire responses. The district court denied the motions, and Allina appeals, contending that the evidence does not support a finding of negligence or causation and that the district court abused its discretion in excluding evidence, denying a mistrial, and declining to hold a *Schwartz* hearing and erred in instructing the jury. We affirm.

## FACTS

In the summer of 1995, Mary Blatz lived at 18555 Halifax Lane in Jordan with her husband, Patrick Sherman, and their two children. On the morning of June 18, 1995, shortly after awakening, Blatz told Sherman she was having trouble breathing. Three days earlier, Blatz had had arthroscopic knee surgery, for which she was taking antibiotics and pain medication. Blatz told Sherman she thought he should call a doctor. Sherman asked whether he should call their family physician or 911, and when Blatz did not immediately answer, Sherman dialed 911.

The Scott County 911 tape indicates that Sherman's call was received at approximately 8:50 a.m. Sherman told the dispatcher that his wife was "having severe chest pains in a bad way right now ." The dispatcher confirmed the family's address and telephone number, notified the Scott County Sheriff's Office, and notified the HealthSpan dispatcher. The HealthSpan dispatcher, in turn, notified HealthSpan paramedics, and the ambulance was en route at 8:53 a.m.

Blatz and Sherman's 13–year–old son, Lucas, alarmed at his mother's condition, independently called 911 at 8:55 a.m. The Scott County operator transferred Lucas to the HealthSpan dispatcher. Lucas took the phone to his father, and the dispatcher began giving Sherman "pre-arrival instructions." The dispatcher asked Sherman to count out loud the number of times that Blatz breathed while the dispatcher watched the clock. When Sherman indicated that Blatz had not taken a breath for 15 seconds, the dispatcher instructed Sherman to begin giving Blatz CPR. Sherman

had just begun administering CPR when Scott County Deputy Brian Wondra arrived between 9:03 and 9:04 a.m. Sherman testified that up to the time the deputy arrived, Blatz was breathing, but taking deep, labored breaths.

The deputy had not previously driven to the end of the lane where the Blatz–Sherman house is located, but had no problem finding the house. On arrival, he made a primary survey of Blatz's condition and determined that she was not breathing and had no heartbeat. Because the positive-pressure airway mask was missing from the deputy's oxygen kit, he could not administer oxygen to Blatz. Instead, he and Sherman continued to perform CPR until the paramedics arrived.

The paramedics did not have a problem locating Halifax Lane. They turned on Halifax and proceeded north toward the Blatz–Sherman house. Halifax extends north from 190th Street for approximately one-half mile and has four driveways marked by mailboxes. The address numbers are in decreasing order as one travels north on Halifax, going from 18856 to 18681 to 18595 to 18555, the Blatz–Sherman number. When the paramedics arrived at the third mailbox, they could not see the Blatz–Sherman mailbox, which was about 260 feet ahead of them in a cul-de-sac, but they could see the cul-de-sac. To see the mailbox and the post with the house numbers, they would have had to proceed about 50 feet past the third mailbox.

The paramedics concluded that Halifax Lane ended at the cul-de-sac and thought they had missed the Blatz–Sherman driveway. Their map was not helpful because it showed Halifax Lane ending in a straight line at the top of the page. The paramedics knew that the numbers generally decreased as they went north, but apparently misread the first mailbox on Halifax Lane and thought either the houses were not numbered in the usual order or they had the wrong address. Rather than proceeding to the end of Halifax and turning

around in the cul-de-sac, the paramedics did a three-point turn and started south on Halifax toward 190th Street. They saw no mailbox with the 18555 number, but continued out onto 190th and turned east to check the address of a house on a lane off 190th Street. They also called the dispatcher to confirm the Blatz–Sherman address.

The paramedics determined that the house on 190th was not the Blatz–Sherman house. The dispatcher confirmed that 18555 Halifax was the right address and told them the house must be between 190th and the end of Halifax Lane. They proceeded back down Halifax, and this time they continued all the way to the cul-de-sac. Once they turned into the cul-de-sac, they could see the Blatz–Sherman mailbox, the driveway, and the deputy's car.

The paramedics estimated the diversion took about one and one-half minutes. A neighbor who saw the ambulance pass by testified the diversion took between three and five minutes. Another neighbor who also saw the ambulance testified the time elapsed by the diversion was "at least two minutes." Mary Blatz's sister, Aimee Blatz, testified that one of the paramedics said at the hospital that the navigation error took "maybe about four minutes."

When the paramedics arrived at the house between 9:08 and 9:09 a.m., Blatz still had no heartbeat and was not breathing. The paramedics inserted an oropharyngeal airway and gave Blatz 100% oxygen; they also established an IV line. One paramedic testified that within three minutes of their arrival, the monitor showed perfusion—that the heart was pumping and the blood was flowing. The other paramedic testified that Blatz's color improved within 30 to 60 seconds and her pulse returned within one to two minutes.

Blatz remained in a coma for approximately four weeks. No one has been able to determine what caused her initial cardiopulmonary arrest. But the arrest

caused an anoxic brain injury that resulted in a severe loss of mental and physical capacity. Blatz is permanently disabled, is incapable of caring for herself, and lives in a nursing home. The medical evidence uniformly indicated that her condition will not improve. By January 2000, Blatz had incurred medical expenses of about $469,000.

Blatz's theory of recovery at trial was that Allina's employees were negligent because "a reasonably prudent driver" would have gone "the short distance further to a clearly visible turnaround or cul-de-sac," where the Blatz–Sherman address was clearly displayed on the mailbox post, rather than make a "three- or four-point turnaround in the middle of the street" and go back to 190th Street. On the damage issue, Blatz's witnesses included a physician who works as assistant director of a hospital's emergency department. The witnesses testified that if the paramedics had not been delayed for the time it took to drive to 190th Street and back, they would have arrived at the Blatz–Sherman household approximately two to five minutes earlier. According to the physician's testimony, this time period was within the window of opportunity in which Blatz could have been revived and irreversible brain damage could have been prevented.

Allina's defense theory rested on the testimony of two expert witnesses, a physician specializing in neurology and a physician specializing in pulmonary and respiratory disorders. Both expressed the opinion that the irreversible brain damage was complete before the deputy's arrival, and thus the paramedics' initial inability to locate the house had no effect on the brain injury Blatz suffered. On the breach-of-duty issue, Allina offered the testimony of two expert witnesses on professional standards of ambulance drivers, but the court excluded the evidence after ruling that the allegedly negligent conduct was within the knowledge of laypersons.

During trial, Allina moved for a mistrial, alleging that the testimony of Aimee Blatz on the paramedic's statement that the diversion took four minutes was not properly disclosed to Allina. At the close of Blatz's case-in-chief, Allina moved for a directed verdict. The district court denied both motions.

The jury found that Allina was negligent in responding to the 911 call and that this negligence was a direct cause of Blatz's injuries. Allina brought posttrial motions for JNOV and a new trial. Allina also requested a *Schwartz* hearing to determine if two jurors had truthfully answered voir dire questions. The district court denied the motions, and Allina appealed. On appeal, although Allina challenges a jury instruction relating to damages, it does not dispute the jury's $11 million damage award.

## ISSUES

I. Is Allina entitled to judgment notwithstanding the verdict because Blatz failed to establish the applicable standard of care or causation?

II. Is Allina entitled to a new trial because the district court either abused its discretion in excluding (a) expert evidence on the standard of care for ambulance drivers and paramedics or (b) evidence on the alleged negligence of Scott County Deputy Sheriff Wondra, or erred in instructing the jury on (a) negligence or (b) a pre-existing medical condition?

III. Did the district court abuse its discretion in failing to declare a mistrial for failure to disclose the content of a late-noticed witness's testimony?

IV. Did the district court abuse its discretion in denying Allina a *Schwartz* hearing to inquire into the truthfulness of two jurors' voir dire responses?

## ANALYSIS

### I

Allina first claims it is entitled to JNOV because Blatz failed to establish a

prima facie case of negligence. Judgment notwithstanding the verdict is proper when a jury verdict has no reasonable support in fact or is contrary to the law. *Diesen v. Hessburg,* 455 N.W.2d 446, 452 (Minn. 1990). Whether to grant JNOV presents an issue of law, but the analysis admits every inference reasonably to be drawn from the evidence, and an order denying JNOV should stand unless the evidence is practically conclusive against the verdict. *Seidl v. Trollhaugen, Inc.,* 305 Minn. 506, 507, 232 N.W.2d 236, 239 (1975). The same standard applies whether the issue is raised by motion for directed verdict or motion for JNOV. *Dean v. Weisbrod,* 300 Minn. 37, 41, 217 N.W.2d 739, 742 (1974). The appellate courts must consider the evidence in the light most favorable to the prevailing party, and the jury's verdict must stand if it can be sustained on any reasonable theory of the evidence. *Id.* at 42, 217 N.W.2d at 742.

### *Standard of Care*

Allina contends that Blatz failed to establish a prima facie case of negligence because Blatz did not present expert testimony establishing either the appropriate standard of care for the paramedics or its breach. Allina argues that because ambulance drivers and paramedics are "professionals," their conduct should be measured not under the reasonable-person standard, but under the standard professionals would be held to under like circumstances.

In their requested jury instructions, both Blatz and Allina included CIVJIG 25.10, the reasonable-person instruction, rather than an instruction defining the higher standard of care applicable to professionals. *See* 4 *Minnesota Practice,* CIVJIG 25.10 (1999). But during in-chambers discussions on the first morning of trial, Allina's counsel, in a discussion on the admissibility of Blatz's expert testimony defining the role of paramedics, indicated he was considering submitting a supplemental jury instruction encompassing more than "straight negligence." In an in-

chambers discussion two days later, Allina's counsel, objecting to the court's ruling that expert testimony was unnecessary to determine whether the paramedics had breached their duty, again referred to a supplemental jury instruction "having to do with [the] behavior of paramedics."

Near the close of Blatz's case, Allina submitted a supplemental jury-instruction request. Allina patterned its requested instruction after CIVJIG 80.10, which defines the standard of care for doctors or dentists. 4A *Minnesota Practice,* CIVJIG 80.10 (1999). But unlike the standard instruction for doctors and dentists, which provides that a "failure of a treatment is not negligence if the treatment was an accepted treatment," Allina's proposed instruction stated that an "unsuccessful decision made during emergency services is not negligence if the decision was acceptable based on the information the paramedic had, or should reasonably have had, when the decision was made."

Allina preserved its right to argue the issue on appeal by submitting the supplemental instruction. The alleged failure to present a prima facie case was also the basis on which Allina moved for a directed verdict. Allina initially raises the standard-of-care issue as a structural error that improperly allowed Blatz's claim to go to the jury despite a failure to present a prima facie case of negligence.

Negligence is "a departure from a standard of conduct required by the law for the protection of others against unreasonable risk of harm." *Seim v. Garavalia,* 306 N.W.2d 806, 810 (Minn.1981) (quoting William L. Prosser, *Contributory Negligence as a Defense to Violation of a Statute,* 32 Minn. L.Rev. 105, 110 (1948)). Generally, negligence claims present questions of fact not susceptible to summary adjudication. *Illinois Farmers Ins. Co. v. Tapemark Co.,* 273 N.W.2d 630, 633–34 (Minn.1978). But the standard of care presents a question of law because it defines a legal obligation to be determined only by the court and from which the jury

may not deviate. W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 37, at 236 (5th ed.1984).

An ordinary person has a duty to do what a reasonable person would do under the same or similar circumstances. *Id.* A person providing professional services, however, is under a duty to exercise such care, skill, and diligence as persons in that profession ordinarily exercise under like circumstances. *City of Eveleth v. Ruble,* 302 Minn. 249, 253, 225 N.W.2d 521, 524 (1974).

Some professionals are customarily held to a professional standard of care. *See, e.g., Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co.,* 366 N.W.2d 271, 279 (Minn.1985) (insurance agents); *Gammel v. Ernst & Ernst,* 245 Minn. 249, 253, 72 N.W.2d 364, 367 (1955) (accountants); *Harris v. Wood,* 214 Minn. 492, 498, 8 N.W.2d 818, 821–22 (1943) (dentists); *Getchell v. Hill,* 21 Minn. 464, 464 (1875) (medical doctors). But other professionals are not subject to that higher standard of care. *See, e.g., Fallin v. Maplewood–N. St. Paul Dist. No. 622,* 362 N.W.2d 318, 321 (Minn.1985) (woodworking instructor had duty to use only due care in supervising students using machine-shop equipment); *Steinbrecher v. McLeod Coop. Power Ass'n,* 392 N.W.2d 709, 713 (Minn. App.1986) ("We believe that painters are too diverse a group to hold to rigid professional standards.").

Only one published Minnesota case involves an ambulance driver's or paramedic's negligence. *Schneider v. Buckman,* 412 N.W.2d 787, 790 (Minn.App.1987), *rev'd on other grounds,* 433 N.W.2d 98 (Minn.1988). But *Schneider* is distinguishable from this case because (a) it involved allegations of negligence in transporting a person with a spinal-cord injury, conduct that is more closely related to the provision of patient care than navigating in search of an address; and (b) the parties in *Schneider* agreed that "ambulance personnel are medical personnel for the purpose of determining the proper standard of care." *Id.*

Courts in other jurisdictions have decided negligence claims involving paramedics and ambulance drivers, but most of these decisions grew out of accidents in which an ambulance collided with a vehicle or another object. In these cases, courts have held that the driving conduct of ambulance personnel is subject only to an ordinary standard of care. *See, e.g., Lee v. Mitchell Funeral Home Ambulance Serv.,* 606 P.2d 259, 261 (Utah 1980) (concluding that in collision of ambulance with cow, ambulance driver owed patients and other persons riding in ambulance a duty to exercise due or ordinary care).

This application of the ordinary standard of care to claims that do not involve medical expertise is consistent with cases in other jurisdictions that subject medical professionals to a reasonable-person standard of care when not furnishing medical treatment to patients, but subject them to the heightened standard applied in medical-malpractice actions when engaged in conduct requiring medical judgment or training or involving scientific judgments. *See, e.g., Lyon v. Hasbro Indus., Inc.,* 156 Ill.App.3d 649, 109 Ill.Dec. 41, 509 N.E.2d 702, 706 (1987) (holding that claim that emergency-medical-services provider failed to provide equipment necessary to render emergency care during transportation to hospital was medical-malpractice claim, but claim that company failed to adequately service and maintain ambulance was ordinary-negligence claim); *Bleiler v. Bodnar,* 65 N.Y.2d 65, 489 N.Y.S.2d 885, 479 N.E.2d 230, 236 (1985) (holding that claims against hospital and nurse for failure to identify metal fragment in eye were properly treated as medical-malpractice claims, but claims against hospital for failure to provide competent emergency medical personnel and to promulgate regulations related to patient care were negligence claims); *Smith v. Pasquarella,* 201 A.D.2d 782, 607 N.Y.S.2d 489, 491 (N.Y.App.Div.1994)

(holding that claim that doctor manipulated patient's leg in manner causing injury was medical-malpractice claim, but claim that doctor removed patient's crutches from her reach thus forcing her to hop across the room to retrieve them was ordinary-negligence claim); *Zellar v. Tompkins Community Hosp., Inc.*, 124 A.D.2d 287, 508 N.Y.S.2d 84, 86 (N.Y.App.Div. 1986) (concluding that medical-malpractice standard of care applied to whether hospital staff responded to patient call for assistance in timely manner and general-negligence standard of care applied to allegation that hospital failed to maintain adequate staff for patient care).

■ Minnesota courts have adopted a comparable analytical structure in disputes over whether a particular claim is subject to the medical-malpractice statute of limitations or the general-negligence statute of limitations. Typically, a claim is subject to the medical-malpractice statute of limitations if it involves negligent conduct that is connected to a person's professional licensure. *See Kaiser v. Memorial Blood Ctr. of Mpls., Inc.*, 486 N.W.2d 762, 767 (Minn.1992). In *Kaiser*, the court held that a claim against a blood bank was subject to the general-negligence statute of limitations not only because blood banks were not expressly listed as a class of defendants under the medical-malpractice statute, but also because the alleged negligence involved administrative or standardizing functions for which a professional license was not required. *Id.* at 766, 768. The court thus drew an important analytical distinction between "malpractice by professionals acting pursuant to their professional licensure [and] negligence based on conduct for which a professional licensure is not required." *Id.* at 767.

Minnesota courts have applied the *Kaiser* distinction in other cases. *See Henderson v. Allina Health Sys.*, 609 N.W.2d 7, 9 (Minn.App.2000) (concluding that hospital employee's decision not to raise patient's bed rails required a medical judgment and thus amounted to medical

malpractice rather than ordinary negligence), *review denied* (Minn. June 13, 2000); *D.A.B. v. Brown*, 570 N.W.2d 168, 171 (Minn.App.1997) (classifying claim that physician breached fiduciary duty by taking kickbacks from drug companies for prescribing certain drugs as medical-malpractice claim because scheme was "dependent on the medical diagnosis, treatment and care of the patients").

Minnesota law requires persons who operate ambulance services to be licensed. *See* Minn.Stat. § 144E.10, subd. 1 (2000). It also requires ambulance-service employees such as first responders to register and to complete several requirements, including specialized training programs, to obtain and keep their employment. *See* Minn.Stat. § 144E.27 (2000). But with respect to operating ambulances on public roadways, Minnesota statutes impose only a duty to drive with due regard for the safety of others on the roadways, a duty consistent with the standard of ordinary negligence for non-treatment-related conduct such as driving. Minn.Stat. § 169.17 (2000).

■ Relying on the distinction demonstrated by *Kaiser*, we conclude that when paramedics furnish medical treatment to a patient, a medical or professional standard of care should apply. But when paramedics are performing functions not requiring professional training or judgment, such as using an address to locate a home when responding to an emergency, then a heightened standard of professional care is not required. Blatz predicated her negligence claim on conduct that did not involve medical judgment or training. Thus, the district court did not err in determining that the standard of care applicable in this narrow fact situation should be that of a reasonable person and not that of a medical professional.

Allina further argues that because Blatz's attorney focused on Allina's internal procedures in his closing argument, these procedures became the standard of

care. In cross-examination, a HealthSpan dispatcher testified that Allina's goal in rural areas is to have paramedics at an emergency scene within 15 minutes of the 911 call in 90% of the cases. In this case, it took the paramedics 17 to 18 minutes to arrive at the Blatz–Sherman house.

Allina argues that its 15–minute internal goal became the standard of care because Blatz's counsel used it that way in his closing argument. We do not condone counsel's references to this "15–minute criterion" in his final argument. But Allina's attorney did not object to questions relating to the criterion, did not request that Blatz's attorney be prohibited from referring to those answers in closing argument, did not object when the references were made in final argument, and did not request a curative instruction. Counsel's statements in final argument, to which there was no objection, do not retrospectively define the standard of care. The standard of care is a legal issue and was properly determined by the district court and stated in the jury instructions. To the extent that Allina concluded that references to its internal response goal may have suggested a heightened standard of care, its remedy was to preserve its objection at trial. Allina did not preserve its objection and may not overcome that failure by recasting an evidentiary issue as a definition of the standard of care.

Allina's final argument on the negligence standard is that because the paramedics arrived at the Blatz–Sherman house within "30 minutes travel time at maximum allowable speeds," they are not negligent as a matter of law. See Minn. R. 4690.3400, subp. 3(C) (1999) (defining maximum size of service area in smaller cities). We reject this argument for two reasons. First, as the district court observed, the purpose of the rule is to define the maximum size of the service area. The rule could not reasonably be construed to dictate the standard of care, for instance, for responding to calls from houses within one block of the ambulance

service. Second, as a general matter, a person's compliance with a statute or ordinance regulating conduct is not conclusive proof that the person exercised due care. *Blasing v. P.R.L. Hardenbergh Co.*, 303 Minn. 41, 49, 226 N.W.2d 110, 115 (1975). The administrative rule does not establish the standard of care in this case.

### Causation

Allina also argues that Blatz and Sherman failed to prove that Allina's negligence caused Blatz's injury. The district court found that Blatz satisfied the burdens of proof and production on causation.

For a party's negligence to be the proximate cause of an injury, "the act [must be] one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others," even though the party "could not have anticipated the particular injury which did happen." *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn.1995) (citations omitted). The plaintiff must show "that the defendant's conduct was a substantial factor in bringing about the injury." *Id.* (citation omitted). Proximate cause is usually a question of fact for the jury. *Id.* at 402. But proximate cause can become a question of law if reasonable minds can come only to one conclusion. *Id.*

Allina argues that Blatz failed to prove causation because Blatz's expert, Dr. Frederic Condo, did not explicitly state that had the paramedics given Blatz supplemental oxygen three minutes earlier, Blatz would have suffered no brain injury. Condo's testimony, however, includes equivalent statements throughout. Relying on his work in emergency rooms, caring for cardiac patients, providing emergency helicopter air-transport service, teaching paramedics, and providing ambulance service, Condo testified that (a) the paramedics "played a substantial part or role in [Blatz's] brain injury * * * because of the delay"; (b) "[e]very second is critical because the brain, when deprived of

oxygen, is extremely sensitive"; (c) "there's only a certain window within which the brain must be reperfused and reoxygenated or irreversible damage will occur"; (d) the period for which the brain can be without oxygen before permanent damage occurs is five minutes; (e) if persons are resuscitated within the five-minute window, the outcome is "[u]sually good, without any perceptible irreversible brain damage"; and (f) "the longer * * * outside [the] 5–minute window" resuscitation occurs, "the more irreversible brain damage occurs."

 Allina argues that it is conjecture that the paramedics' actions, rather than the administration of CPR or some unknown cause, resulted in Blatz's reperfusion. But Condo premised his opinion on fact statements from witnesses who were observing and monitoring Blatz. It is well established that an opinion of a medical expert witness based on an adequate factual foundation is not conjecture, and the expert is permitted to make legitimate inferences, which have probative value in determining disputed fact questions. *Hiber v. City of St. Paul,* 219 Minn. 87, 91, 16 N.W.2d 878, 880 (1944).

 On adequate facts, causation is ultimately a jury issue. *Lubbers,* 539 N.W.2d at 402. As a reviewing court, we do not determine which experts we would have believed, but whether the jury had adequate facts to support its finding of causation. The record provides an adequate basis for the jury's finding. The district court did not abuse its discretion in denying a directed verdict or JNOV.

## II

 Allina alternatively argues that it is entitled to a new trial because of evidentiary and jury-instruction errors. The granting of a new trial rests largely within the district court's discretion, and reversal is warranted only when the district court's decision involves a violation of a clear legal right or a manifest abuse of discretion.

*State Farm Fire & Cas. v. Short,* 459 N.W.2d 111, 114 (Minn.1990); *Templin v. Crestliner, Inc.,* 263 Minn. 149, 151, 116 N.W.2d 178, 180 (1962).

### Claimed Evidentiary Errors

Allina alleges that two evidentiary errors require a new trial. First, Allina contends that the exclusion of expert testimony defining a paramedic's role violated its due process right to present a defense. Second, Allina maintains that the district court abused its discretion in excluding evidence on Wondra's failure to have a complete oxygen kit. We disagree.

In preliminary discussions at the beginning of trial, the court, ruling on objections to deposition testimony, attempted to ascertain the specific basis for Blatz's negligence claim. Blatz's attorney stated that the claim was not based on inadequate medical training or medical care but rather on the paramedics' driving conduct in failing to go to the cul-de-sac at the end of Halifax and instead turning around in the middle of the road and driving back to 190th Street. Relying on Blatz's attorney's description of Blatz's claim, the district court ruled that expert testimony was not required because the issues Blatz's claim raised were within the jury's common understanding. "This is not a matter of expertise. All the people on the jury drive." Allina later made an offer of proof indicating that both experts were prepared to testify to the standard of care for paramedics in responding to emergency situations.

 The decision to allow expert testimony is within the district court's sound discretion and will not be reversed unless the court misapplies the law or abuses its discretion. *Uselman v. Uselman,* 464 N.W.2d 130, 138 (Minn.1990). To require a new trial, the exclusion of evidence must be both an abuse of discretion and prejudicial. *Id.*

 Allina's claim that the exclusion of its expert witnesses amounts to a due pro-

cess violation reconfigures the standard of review and has no basis in Minnesota law. Allina has provided no cases that support its theory. Certainly the right to a trial includes, among other rights, the right to be heard, to produce witnesses, and to examine and cross-examine witnesses. *State ex rel. Spurck v. Civil Serv. Bd.*, 226 Minn. 240, 247, 32 N.W.2d 574, 579 (1948). But it does not include an absolute right to present expert testimony.

 Instead, whether expert testimony is required depends on the nature of the question to be decided by the trier of fact and on whether technical or specialized knowledge will assist the trier of fact. *Bernloehr v. Central Livestock Order Buying Co.*, 296 Minn. 222, 225, 208 N.W.2d 753, 755 (1973); *see* Minn. R. Evid. 702 (setting forth standard for admitting expert testimony). When a claim is predicated on conduct subject to a professional standard of care, expert evidence is generally required to support the claim. *Hestbeck v. Hennepin County*, 297 Minn. 419, 424, 212 N.W.2d 361, 364 (1973). But expert testimony is not necessary when the issues are "within an area of common knowledge." *Id.* (holding no expert testimony necessary to support claim that surgeon negligently left sponge in patient after gallbladder surgery because the error fell "within an area of common knowledge and developing lay comprehension of medical techniques").

 The district court concluded that whether the paramedics were negligent in locating a house in response to an emergency call was a question largely within the jury's knowledge and experience. The court thus ruled that expert testimony was not necessary. This ruling is consistent with our earlier conclusion that the district court appropriately instructed the jury on the reasonable-person standard of care. The district court thus did not abuse its discretion in excluding expert testimony.

Allina also alleges the district court erred in excluding evidence of the deputy's conduct in responding to the call. Blatz initially sued Scott County as well as Allina. But the district court granted summary judgment to Scott County, concluding that the "public-duty doctrine" precluded liability. This court affirmed. *See Blatz v. Allina Health Sys.*, 1998 WL 901744, No. C5-98-1082 (Minn.App. Dec.29, 1998), *review denied* (Minn. Apr. 20, 1999).

Allina does not advance any theory under which Scott County would be liable for Blatz's injuries. Instead, Allina asserts that the jury should have been allowed to consider the paramedics' reasonable assumption that the deputy was at the Blatz–Sherman house before they arrived and that he was administering oxygen to Blatz.

 Evidentiary rulings are within the district court's sound discretion and will not be reversed absent an abuse of discretion. *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 725 (Minn.1983). Reversible evidentiary error must be both an abuse of discretion and prejudicial. *Id.*

 The district court excluded evidence of the deputy's failure to have a complete oxygen kit because it concluded that any relevance was substantially outweighed by the danger of unfair prejudice and jury confusion. *See* Minn. R. Evid. 403; *see also Albert v. Paper Calmenson & Co.*, 515 N.W.2d 59, 68 (Minn.App.1994) (excluding evidence relating to a dismissed third party's possible negligence was proper because the evidence would have misled the jury), *aff'd as modified*, 524 N.W.2d 460 (1994). Because Allina has advanced no supportable theory that Scott County could be held liable for the injuries, additional evidence on the deputy's conduct would not reasonably have helped the jury and could have caused confusion. Also, because the jury heard evidence that the deputy was at the Blatz–Sherman home and assisted Sherman in giving Blatz CPR, there is no evident prejudice. Allina is not entitled to a new trial because evidence of the deputy's conduct was excluded.

### Jury Instructions

 Allina argues that the district court's jury instructions on negligence·and a pre-existing condition constitute error. District courts have considerable latitude in selecting language used in the jury charge and in determining the propriety of a specific instruction. *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn.1986). To determine whether an instruction constitutes error, the instructions must be read as a whole, keeping in mind the evidence in the case. *Lindstrom v. Yellow Taxi Co.*, 298 Minn. 224, 229, 214 N.W.2d 672, 676 (1974). If the charge as a whole properly states the law, this court will not reverse simply because the objecting litigant preferred other language. *Alholm*, 394 N.W.2d at 490. Errors in jury instructions are not grounds for a new trial unless the error is prejudicial. *Lewis v. Equitable Life Assurance Soc'y of the United States*, 389 N.W.2d 876, 885 (Minn.1986).

First, Allina argues that the district court's use of jury instructions setting forth the general definitions of "reasonable care" and "negligence" improperly prejudiced the jury. We have addressed this issue in conjunction with Allina's JNOV and due process arguments. Because we have concluded that the appropriate standard of care to be applied to the paramedics' conduct is the reasonable-person standard, the court's instruction was not erroneous.

 We further observe that the instruction Allina requested in lieu of the reasonable-care instruction the court gave demonstrates the difficulty of imposing an expert standard of care on these facts. In attempting to adapt the medical-malpractice instruction, Allina could find no ready substitute for the failure of an "accepted treatment" that is excluded from the definition of negligence in the medical-malpractice standard. *See* 4A *Minnesota Practice*, CIVJIG 80.10 (1999). Instead, the instruction proposed that an unsuccessful "treatment" decision is not negligent "if the decision was acceptable." But the proposed instruction did not indicate to which professional community the decision must be acceptable. As such, it did not accurately state the law. A district court acts within the range of discretion by rejecting a jury instruction that does not accurately state the law. *See Alholm*, 394 N.W.2d at 490 (rejecting an instruction that standard should be "the highest degree of care," when proprietor only had a duty to exercise reasonable care).

Second, Allina alleges that the district court's instruction on a pre-existing condition, based on CIVJIG 91.40, misstates the law. *See* 4A *Minnesota Practice*, CIVJIG 91.40 (1999). As a threshold matter, the record discloses that although Allina objected to the use of this instruction in posttrial motions, it did not object before the jury was charged. Instead, Allina's counsel asked for and received changes in the instruction's wording.

 When a litigant fails to object to an instruction before the jury begins its deliberations, appellate review is limited to whether the instruction contains an error of fundamental law. *Kallevig v. Holmgren*, 293 Minn. 193, 198 n. 6, 197 N.W.2d 714, 718 n. 6 (1972); *see also* Minn. R. Civ. P. 51 ("An error in the instructions with respect to fundamental law or controlling principle may be assigned in a motion for a new trial although it was not otherwise called to the attention of the court."). To constitute fundamental error, the instruction must destroy the substantial correctness of the charge considered as a whole, cause a miscarriage of justice, or result in substantial prejudice on an issue that is vital to the litigation. *Clifford v. Peterson*, 276 Minn. 142, 145, 149 N.W.2d 75, 77 (1967).

 Although Allina now objects to the entire instruction, its argument is directed to the last sentence of the instruction. Joined by amici curiae, Allina argues that the last sentence impermissibly shifts the burden of proving causal damages from

the plaintiffs to the defendants. The instruction given at trial reads:

Now, there is evidence that Mary Blatz had a pre-existing medical condition prior to the arrival of the Allina ambulance. Allina Health Systems is liable only for the damages that you find to be directly caused by the negligence, if any. *If you cannot separate damages caused by the pre-existing medical condition from those caused by Allina's negligence, if any, then Allina is to be held liable for all of the damages.*

4A *Minnesota Practice,* CIVJIG 91.40 (1999) (emphasis added). Although this instruction is based on CIVJIG 91.40, it differs from the standard CIVJIG form in that it refers to damages caused by "Allina's negligence," rather than damages caused by the "accident."

CIVJIG 91.40 is intended to take the place of CIVJIG 163 from the 1986 edition of the Jury Instruction Guides, which read:

A person who has a defect or disability at the time of an accident is nevertheless entitled to damages for any aggravation of such pre-existing condition, even though the particular results would not have followed if the injured person had not been subject to such pre-existing condition. Damages are limited, however, to those results which are over and above those which normally followed from the pre-existing condition, had there been no accident.

4 *Minnesota Practice,* CIVJIG 163 (1986).

The principles expressed in the new instruction's last sentence are drawn in part from the rules apportioning liability contained in the Restatement (Second) of Torts §§ 433A & 433B (1965). The restatement's central apportionment rule is that damages may be apportioned among causes when the causes have combined to bring about a single harm if the harm is capable of reasonable division. Restatement, *supra,* § 433A. The rule provides for liability apportionment among at-fault defendants and also for damage apportionment among innocent causes such as the plaintiff's conduct, a force of nature, or a pre-existing condition. *Id.* & cmts. a, e.

Minnesota adopted the Restatement concept of apportioning liability among at-fault defendants in *Mathews v. Mills,* 288 Minn. 16, 22, 178 N.W.2d 841, 845 (1970). Analyzing liability for a passenger's injuries in a multiple-impact collision, the court held that "unless the damage caused by each [tortfeasor] is clearly separable, permitting the distinct assignment of responsibility to each, each is responsible for the entire damage." *Id.* at 21, 178 N.W.2d at 844 (quotation omitted). The burden of proving that the harm is capable of being divided lies with each defendant who contends it can be divided. *Id.* at 22, 178 N.W.2d at 845. If the court determines the harm is divisible, the actual apportionment is a fact question for the jury. *Id.* at 22–23, 178 N.W.2d at 845. The court, relying on principles of joint and several liability, reasoned that placing the burden of proof on the defendant "is a result of a choice made as to where a loss * * * shall fall-on an innocent plaintiff or on defendants who are clearly proved to have been at fault." *Id.* at 22, 178 N.W.2d at 845.

CIVJIG 91.40 extends beyond *Mathews* in two significant ways. First, it treats aggravation of an injury as an apportionable cause. Thus it embraces the second part of section 433A by apportioning harm not just among at-fault defendants, but between a pre-existing condition and an at-fault defendant. Second, it places the burden of proof for the apportionment of aggravation on the at-fault defendant. Because the apportionment of aggravation of an injury is not between two at-fault defendants, as in *Mathews,* but rather between a pre-existing condition and an at-fault defendant, the principles underlying joint and several liability have thus been extended to circumstances in which they do not apply.

There is precedent in other states for placing the burden of proof on the at-fault defendant when apportioning damages be-

tween an at-fault defendant and an innocent or pre-existing cause. *See, e.g., Newbury v. Vogel*, 151 Colo. 520, 379 P.2d 811, 813 (1963) (holding that defendant was responsible for the entire damage when court found it impossible to apportion between damages from accident and damages from pre-existing arthritic condition); *Lovely v. Allstate Ins. Co.*, 658 A.2d 1091, 1092 (Me.1995) (holding that defendant was liable for all damages to plaintiff's elbow when court was unable to apportion injuries between accident and pre-existing fracture); *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726, 730 (1996) (concluding that burden of apportioning damages resulting from tort and from pre-existing medical conditions "rests squarely on the defendant"); *Bigley v. Craven*, 769 P.2d 892, 898 (Wyo.1989) (holding that jury should be instructed that if it is unable to apportion plaintiff's damages among a pre-existing disability and a condition caused by an accident, then the defendant is liable for the entire damages). *See generally* Dan B. Dobbs, *The Law of Torts* § 174, at 425 (2000); W. Page Keeton, *Prosser and Keeton on The Law of Torts* § 52, at 349 (5th ed.1984).

The use note for CIVJIG 91.40 explains that the plaintiff has the burden of proving the extent of his or her damages, but the defendant has the burden of apportioning damages. The use note's explanation of burdens relies on language in *Canada by Landy v. McCarthy*, 567 N.W.2d 496, 507–08 (Minn.1997). The Eighth Circuit Court of Appeals has also read *Canada* to impose on defendant the burden of proving that damage caused by other factors is divisible and, if so, the amount of the damage to be apportioned. *See Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1293–95 (8th Cir. 1997) (discussing limitation of damages for aggravation as apportionment). *Jenson* ultimately concluded that apportionment did not apply because plaintiff's psychological condition was not a pre-existing condition but a vulnerability addressed by the "eggshell skull" principle. *Id.* at 1295.

We read *Canada* as an application of the doctrine stated in *Mathews* that when two or more at-fault defendants have a substantial part in causing harm to the plaintiff, and one or more of the defendants seeks to limit liability by apportioning the harm, the burden is on each defendant seeking limitation to prove both that the harm is divisible and the amount of the divided harm for which each is not liable. Although some language in *Canada* has been read more broadly, the facts of that case involved only damage apportionment among at-fault defendants. We do not read *Canada* to extend a defendant's burden of proof to apportionment between an at-fault defendant and an innocent or a pre-existing cause.

This allocation of the burden of proof is consistent with the restatement. Although the restatement recognizes that damages may be apportioned between innocent conduct and at-fault defendants, it does not place a burden on a defendant to prove divisibility or the limit of a defendant's own liability unless two or more actors are involved. *See* Restatement, *supra*, § 433B(2), (3) (placing apportionment burden of proof on two or more actors who have combined to cause harm to plaintiff). Comment (g) specifically provides that the failure-of-proof provisions in § 433B(3) apply only when each of two or more actors has been proved to be at fault (rule "has no application to cases of alternative liability" when no proof that the conduct of one or more actor has been tortious).

CIVJIG 91.40 is an ambitious attempt to synthesize aggravation, pre-existing disability, pre-existing medical condition, and apportionment. The terms do not all have precise definitions, and the lack of definition contributes to making the scope of the instruction too broad. With some rewording, the instruction may be a correct statement of the law in a case apportioning damage among two or more defendants whose combined conduct causes a plaintiff harm. But applying the instruction to aggravation of a pre-existing medi-

cal condition to apportion damage between that pre-existing condition and an at-fault defendant not only extends Minnesota law but also conflicts with existing caselaw. *See Leubner v. Sterner,* 493 N.W.2d 119, 122 (Minn.1992) (concluding that while plaintiff must prove that accident caused injury and aggravated a pre-existing condition, the measure of damages is the pain and disability over and above pre-accident pain and disability); *Schore v. Mueller,* 290 Minn. 186, 189–90, 186 N.W.2d 699, 701 (1971) (concluding that plaintiff entitled to recover proved damages for aggravation of pre-existing injury, limited, however, to those damages caused by defendant's negligence); *Nelson v. Twin City Motor Bus Co.,* 239 Minn. 276, 280, 58 N.W.2d 561, 563 (1953) (concluding that plaintiff was entitled to recover damages from aggravation of pre-existing condition caused by defendant's negligence, but limited damages to the amount over and above the amount caused by the pre-existing injury alone).

In this case, however, the instruction neither destroyed the substantial correctness of the charge nor created substantial prejudice on a vital issue. First, the district court crafted the instruction to state that Allina was liable only for damages directly caused by "its negligence, if any," rather than "any damages" caused by "the accident." The instruction is narrowed to the pre-existing medical condition and Allina's negligence, not incorporating any theoretical injuries "caused by the accident" that might not result from Allina's negligence or a pre-existing condition.

Second, the effect of the instruction is limited by the facts of the case. Blatz's expert testified that Blatz sustained irreversible brain injury in the time period between arrival of the deputy at 9:03 to 9:04 a.m. and the paramedics' arrival at 9:08 to 9:09 a.m. Allina's causation experts both testified that Blatz sustained brain damage before the deputy arrived; thus, under Allina's theory of the case, an earlier arrival of the paramedics would not have made a difference because the irreversible injury was completed before 9:03–9:04 when the deputy arrived. The jury was thus presented two alternative theories of causation; those theories were separate, and the evidence did not overlap in a way that resulted in a shifting of the burden of proof. Furthermore, Allina did not argue for apportionment. The jury instruction, while not helpful to the jury, was not prejudicial. Allina is not entitled to a new trial because of the jury instruction on a pre-existing condition.

### III

Allina argues that the district court erred in denying a mistrial because Blatz failed to disclose the substance of Aimee Blatz's testimony. Plaintiffs did not disclose Aimee Blatz as a witness until just before trial, and they failed to disclose the substance of her testimony prior to trial. Aimee Blatz testified that paramedic Anderson, when referring to the paramedics' delay in reaching the Blatz–Sherman residence, said that the trip "took maybe about four minutes and that made all the difference."

Although Allina's counsel did not object during Aimee Blatz's testimony, counsel moved for a mistrial after the jury was excused for the day. The district court denied the motion but permitted Allina to take Aimee Blatz's deposition and recall her as a witness, at counsel's discretion. Allina's counsel took Aimee Blatz's deposition but did not recall her.

The decision to grant a new trial based on claimed attorney misconduct rests wholly within the trial court's discretion. *Johnson v. Washington County,* 518 N.W.2d 594, 600 (Minn.1994). The misconduct must clearly result in prejudice to the losing party. *Eklund v. Lund,* 301 Minn. 359, 362, 222 N.W.2d 348, 350 (1974).

Although the attorneys disagree on what was disclosed about the anticipated content of Aimee Blatz's testimony, it is

clear that Blatz had a continuing obligation to keep opponents "apprised of any changes in circumstances which make it necessary to call witnesses or to introduce evidence not previously disclosed." *Phelps v. Blomberg Roseville Clinic*, 253 N.W.2d 390, 393 (Minn.1977). But a failure to comply with this obligation is not reversible unless it is prejudicial. *Id.* at 394.

We conclude that the failure to disclose was not so prejudicial that it requires a mistrial. Sherman had already testified that Anderson on more than one occasion expressed essentially the same regret to Sherman about the paramedics' delay. Aimee Blatz's testimony recounting Anderson's remark likely did not prejudice the defense because the jury had already heard similar testimony from Sherman. In addition, the curative measure of allowing Allina to depose Aimee Blatz after her testimony weighs against any finding of prejudice. *See VanHercke v. Eastvold,* 405 N.W.2d 902, 906 (Minn.App.1987).

**IV**

Finally, Allina argues that the district court erred in denying a *Schwartz* hearing because of alleged juror misconduct. Allina based its claim of juror misconduct on one juror's failure to acknowledge a relationship with an Allina company and another juror's failure to acknowledge that he had been involved in a legal proceeding.

The decision of whether to grant a *Schwartz* hearing is within the district court's discretion. *Zimmerman v. Witte Transp. Co.,* 259 N.W.2d 260, 262 (Minn.1977). Generally, a party may not point to juror incompetency after that juror is accepted and sworn if the party knew of the juror's incompetency beforehand and was silent. *Moose v. Vesey,* 225 Minn. 64, 69, 29 N.W.2d 649, 653 (1947). A *Schwartz* hearing is mandated when the evidence, "standing alone and unchallenged, would warrant the conclusion of jury misconduct." *Johnson v. Ramsey County,* 424 N.W.2d 800, 805 (Minn.App.

1988) (quoting *State v. Larson,* 281 N.W.2d 481, 484 (Minn.1979)), *review denied* (Minn. Aug. 24, 1988).

Allina admits that it discovered information relating to the first juror's insurance coverage in its billing records and discovered the second juror's arrest record after the trial had concluded. The district court reasonably concluded that Allina could have discovered this information earlier.

The first juror apparently did not respond when asked if any juror or juror's family members had received medical treatment at an Allina entity or received health insurance from Medica, an Allina entity. After the trial, Allina learned that the juror's family members had been treated at Allina facilities from 1997 to 1999. Those facilities had pursued collection of past-due accounts through Reliance Recoveries, Inc., an Allina-owned collection agency. Reliance Recoveries sent the family mail in connection with the accounts and spoke once to the juror and also to her husband on the telephone about the accounts. The family appeared to have been insured by Medica in 1997, although HealthPartners, a non-Allina company, also insured them.

Although the juror was insured by Medica and received care at Allina facilities, Allina's billing records show that the juror knew of some of the Allina companies or their agents by the names "Reliance Recoveries," "St. Francis Regional Medical Center," and "Shakopee Physician Services." The district court found that the juror was not withholding information when the juror did not disclose this relationship, because the juror may not have realized that these entities were part of Allina. *See Collins v. Bridgland,* 296 Minn. 93, 96–97, 206 N.W.2d 652, 654–55 (1973) (upholding district court's refusal to conduct jury-misconduct hearing when a juror did not affirmatively respond to question of whether any juror had an interest in State Farm Mutual Insurance Company, even though juror's husband

had leasing arrangement with State Farm and the juror had two State Farm auto insurance policies). The juror's relationship with Allina was too inconsequential to have resulted in prejudice.

Allina further alleges that another juror did not answer truthfully when he failed to respond to a question seeking to determine whether any of the prospective jurors had been involved in legal proceedings. After the trial, Allina obtained evidence that the juror had been arrested for shoplifting in 1998 but the charges had been continued for dismissal. The district court characterized the question as inquiring whether any juror had a criminal conviction. The record before this court contains no transcript of the precise question asked during voir dire. The district court found that the juror did not lie when asked about a conviction because the charges were dismissed without a conviction. In the absence of a transcript, and in light of the dismissal, Allina has not established that the juror's answer was untruthful or represented misconduct. The district court's denial of a *Schwartz* hearing was not an abuse of discretion.

### DECISION

The district court did not err in denying JNOV, a new trial, or a *Schwartz* hearing.

**Affirmed.**